**E-FILED**
Wednesday, 19 September, 2007  11:57:53 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

**LINDY HOLLGARTH,**
    **Plaintiff,**

                    **v.**                                              05-2125

**JERRY DAWSON, et al.,**
        **Defendants.**


### OPINION

Before the court are the defendants' summary judgment motion [42], the plaintiff's response [49] and the defendants' reply [50].


### Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992). Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical

doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

## Background

Lindy Hollgarth has filed a pro se complaint pursuant to 42  U.S.C. Section 1983 directed at Macon County Sheriff Jerry Dawson and twelve correctional officers employed by Sheriff Dawson in the Macon County jail.  Hollgarth's claims arise out of his detention in the jail during 2003.  All defendants are sued in their individual capacities, except for Sheriff Dawson, who also has been named in his official capacity.

Hollgarth filed suit on March 14, 2005 in the Circuit Court of Macon County.  The defendants removed the suit to this court. Hollgarth has filed two amended complaints, in which he has added defendants and added and subtracted claims. The Second Amended Complaint, the current pleading, presents the following claims: (a) that Hollgarth was subjected to excessive force on two occasions in violation of his Eighth and Fourteenth Amendment rights; (b) that the use of excessive force also constituted the tort of battery; (c) that he did not receive medical treatment after one such incident; (d) that he was subjected to sexual harassment in violation of his Eighth and Fourteenth Amendment rights when he was the subject of strip searches within the jail; (e) that his placement in segregation was in violation of his rights to due process pursuant to the Fourteenth Amendment; and (f) that defendants deprived him of meaningful access to legal material and his litigation papers.  Hollgarth seeks both compensatory and punitive damages. The court hereafter will refer to the Second Amended Complaint as the "Complaint."

The defendants argue that Hollgarth's various claims are subject to summary judgment for numerous alternative reasons.  Defendants argue that  Hollgarth's evidence is insufficient to satisfy his burden of proof on these claims for the following principal reasons:  (a) The evidence establishes that no defendant was responsible for the employment of excessive force against Hollgarth and that the force used against him clearly was not excessive to the need presented at the time, but was justified and minimal, was applied in a good-faith effort to maintain discipline under threatening circumstances, and did not cause injury to Hollgarth.  (b) The decision of jail administrators to subject Hollgarth to visual body cavity searches was a reasonable response to a legitimate security concern raised by Hollgarth's history of repeated attempts to escape from custody and the verified report that Hollgarth and other prisoners were attempting to collect homemade weapons as part of an escape plot; the body cavity searches were conducted in a reasonable manner that has repeatedly been approved by the courts as not being harassing or punitive.  (c) Hollgarth is unable to satisfy his burden of proving that his placement in administrative segregation violated his Fourteenth Amendment rights to due process for the following alternative reasons: (1) confinement in administrative segregation was not punitive in

2

nature since the circumstances of such confinement were comparable to confinement in the jail's general population and did not deny Hollgarth any of the minimal necessities of civilized life; and (2) Hollgarth's confinement in administrative segregation did not deprive him of a liberty interest subject to the protections of due process. (d) Claims added by Hollgarth in amended complaints are barred because the claims were not filed within the applicable limitation periods. (e) Hollgarth is unable to support his claim that he was denied medical care because the undisputed evidence demonstrates that he did not present a serious medical need, correctional officers were not deliberately indifferent to a serious medical need, and he did not suffer any resulting injury. (f) Hollgarth cannot establish that defendants denied him his right of access to the courts since there is no evidence (1) that any defendant was responsible for the loss of Hollgarth's litigation materials or (2) that the loss of such materials actually denied Hollgarth access to the courts or caused him to suffer quantifiable detriment. (g) The individual defendants are entitled to qualified immunity from liability on each of Hollgarth's claims directed against them. (h) Hollgarth's official-capacity claim against Sheriff Dawson is not supported by evidence that policies or practices of the sheriff's office caused violations of Hollgarth's constitutional rights.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1. Plaintiff Lindy L. Hollgarth is currently incarcerated in the Galesburg Correctional Center by the Illinois Department of Corrections. (Hollgarth Dep., pp. 5,6)
2. Jerry Dawson is the Sheriff of Macon County. (Complaint, par. 6; Answer par. 6)
3. In 2003, Lt. Steve Jones was the Warden of the Macon County jail (hereafter, the "Jail"). On August 1, 2003, Lt. John Anderson became Warden. (L. Jones Affid., par. 2)
4. In 2003, Larry Jones was Assistant Warden of the Jail, with the rank of sergeant. Larry Jones now is Warden, with the rank of lieutenant. (L. Jones Affid., par. 3)
5. Charles Woodard, Dewayne Jones, and Jerdean Meeks are correctional officers at the Jail with the rank of sergeant. (Complaint, par. 8,9, 10; Answer, par. 8,9, 10)
6. Randy West is a corrections officer at the Jail with the rank of corporal. (Complaint, par. 11; Answer, par. 11)
7. Craig Kramer, Chris Patient, Bradley Patient, Scott Shaw, Robert Jordan, Stan Boulware, and Scott Shull were corrections officers at the Jail in 2003. (Complaint, par. 12, 13, 14, 15, 16, 17; Answer, par. 12, 13, 14, 15, 16, 17; L. Jones Affid., par. 6)


8. On April 16, 2003, Hollgarth was arrested in the City of Decatur in Macon County on multiple charges, including theft, residential burglary, aggravated fleeing, attempting to

---

[1]The defendants' objections to the plaintiff's statement of fact are sustained because the plaintiff's submission of additional statement of facts, with the exception of a few, are conclusory, argumentative, lacks the necessary specificity, unsupported and immaterial. The court included only the plaintiff's additional statement of facts that comply with the requirements of the applicable rules.

        elude a police officer, and aggravated battery. (Def. Ex. 1; L. Jones Affid., par. 8)

9.      On April 16, 2003, Hollgarth was booked into the Jail as a result of his arrest that day. Hollgarth remained in the Jail as a pretrial detainee until March 11, 2004. (Def. Ex. 2, 3; L. Jones Affid., par. 9)

10.     When booked into the Jail on April 16, 2003, Hollgarth was identified as an "escape risk" because he had a history of attempted escapes and escapes from custody. (Def. Ex. 2, 4; L. Jones Affid., par. 10).

11.     On September 21, 1990, Hollgarth had been convicted in Macon County of felony escape and sentenced to three years in the Illinois Department of Corrections. The charge and conviction resulted from Hollgarth walking away from a work release assignment in Decatur.  (Hollgarth Dep., pp. 9-10; Def. Ex. 5; L. Jones Affid., par. 11)

12.     On November 17, 1993, Hollgarth had been convicted in Macon County of felony escape and was sentenced to five years in the Illinois Department of Corrections. The charge and conviction resulted from Hollgarth fleeing a police squad car after being placed under arrest for multiple charges, including burglary. (Def. Ex. 6; Lt. Jones Affid., par. 12)

13.     On April 2, 1998, Hollgarth had been convicted in Steele County, Minnesota of felony escape and sentenced to serve 64 months in the Minnesota Department of Corrections. The charge and conviction resulted from Hollgarth fleeing a van transporting him and other detainees.  (Hollgarth Dep., pp. 10- 1 1 ; Def. Ex. 7; L. Jones Affid., par. 13)

14.     When Hollgarth was booked into the Jail, he was placed in general population. Because he was classified as an escape risk, his cell assignment was changed approximately every one to two weeks. (L. Jones Affid., par. 15)

15.     The general population in the Jail consists of both pretrial detainees and convicted prisoners.  Convicted prisoners may be housed in the Jail's general population when they are serving sentences of less than one year, are awaiting sentencing or transfer to the Department of Corrections, or have been returned to the Jail to be housed in connection with a court appearance. (L. Jones Affid., par. 16)

16.     Correctional officers in the Jail work on three daily shifts. The first shift is from 6:30 a.m. to 2:30 p.m. The second shift is from 2:30 p.m. to 10:30 p.m. The third shift is from 10:30 p.m. to 6:30 a.m. Generally, officers in the Jail are assigned only to one shift and do not alternate between shifts. (L. Jones Affid., par. 17)

17.     During 2003, West, Boulware, and Woodard worked on the first shift in the Jail. (West Affid., par. 2; Boulware Affid., par. 2; L. Jones Affid., par. 18)

18.     During 2003, Kramer, Jordan, Bradley Patient, Chris Patient, Shull, Shaw, and Meeks worked on the second shift in the Jail. (Kramer Affid., par. 2; Jordan Affid., par. 2; B. Patient Affid., par. 2; C. Patient Affid., par. 2; L. Jones Affid., par. 19; Meeks Affid., par. 2)

19.     Dewayne Jones was on layoff from December 2002 to December 2003 and did not work in the Jail at all during that period. (D. Jones Affid., par. 3; L. Jones Affid., par. 20)

20.     On June 18, 2003, Hollgarth was housed in Cell 1 in Trod 2, Pod C.  Trod 2 consists of three "pods" or cellblocks, each having 14 cells.  All prisoners housed in Trod 2 are in the Jail's general population. (L. Jones Affid., par. 21)

21.   On June 18, 2003, at approximately 5:30 a.m., corrections officer James Davis woke prisoner Raymond Crutchfield, who was to be transported with other prisoners to the Illinois Department of Corrections.  Crutchfield was housed in Trod 2, Pod A, Cell 5.  Crutchfield told Davis that some of the prisoners in Trod 2 were removing metal objects from the ceiling vents to be used in an attempt to escape from the Jail. Crutchfield identified four prisoners in Pod A and three prisoners in Pod C as being involved in the escape plot.  Among the prisoners in Pod C identified by Crutchfield was Hollgarth. (Davis Affid., par. 5,7; Def. Ex. 8)

22.   On June 18, 2003, corrections officers conducted an investigation of the information received from Crutchfield regarding a possible escape. As part of that investigation, officers conducted a shakedown of all cells in Pods 2A and 2C. Teams of officers first removed the prisoners from their cells.  The seven prisoners identified by Crutchfield were moved to cells in Trod 5, Pods A and C.  Other prisoners were removed from their cells and transferred temporarily to the Jail's indoor recreational area.  All prisoners housed in Pods A and C were strip searched.  Each of the cells in Pods A and C was searched by officers. (Davis Affid., par. 6, 7; L. Jones Affid., par. 23; Collins Affid., par. 6 Def. Ex. 8)

23.   On June 18, 2003, teams of corrections officers were assigned to extract from their cells the prisoners housed in Pods 2A and 2C. Each team consisted of three officers. (L. Jones Affid., par. 24)

24.   On June 18, 2003, at approximately 8:00 a.m., a team consisting of officers Terry Collins, Jamie Cox, and John Mayer removed Hollgarth from his cell. When the officers entered Hollgarth's cell, he was sleeping.  The officers grabbed Hollgarth's arms while he was in bed and handcuffed his wrists behind his back.  They ordered Hollgarth to go with them. Hollgarth complied.  Hollgarth was escorted to a cell in Trod 5. (Collins Affid., par. 6,7; West Affid., par. 7; Def. Ex. 9)

25.   On June 18, 2003, at approximately 8:15 a.m., officer Collins conducted a shakedown of Cell 2C-1, Hollgarth's cell.  Collins observed that the base of the stool at the desk in Cell 2C-1 was missing one bolt and that five of the remaining bolts were loose. (Collins Affid., par. 8; Def. Ex. 9)

26.   On June 18, 2003, during their search of the cells in Pod 2A, officers found ceiling vents that had been tampered with, sharpened objects, and other contraband, such as a cotter pin and piece of wire.  In their search on that date of cells in Pod 2C, officers found a ceiling vent that had been tampered with[2]. (L. Jones Affid., par. 25; Davis Affid., par. 7; Def. Ex. 8, 9, 10) No contraband was found in the plaintiff's cell[3].

---

[2]Plaintiff disputes this.  Defendants object. The defendants' objections are sustained as the plaintiff's response does not give rise to a material dispute because his statements are not responsive and do not controvert defendants' statements; plaintiff's response is conclusory and argumentative and plaintiff's response is not supported by reference to supportive and admissible evidence.

[3]See plaintiff's statement of fact [61], -par. 7, not disputed by defendants [62], par. 8.

27.     On June 19, 2003, Hollgarth was charged with attempted escape and criminal damage to state property. (L. Jones Affid., par. 26; Def. Ex. 11)

28.     Sgt. Dewayne Jones and officer Craig Kramer were not on duty in the Jail during first shift on June 18, 2003 and did not participate in the shakedown of Pods 2A and 2C. Dewayne Jones and Kramer were not present in Pod 2C and were not involved in the removal of Hollgarth from his cell on that date.  (D. Jones Affid., par. 5; Kramer Affid., par. 5; L. Jones Affid., par. 27; Collins Affid., par. 9; Hollgarth Dep., pp. 15-16, 19)

29.     Sgt. Larry Jones, Cpl. Randy West, and officer Stan Boulware were on duty in the Jail on first shift on June 18, 2003, but did not remove Hollgarth from his cell on that date. (L. Jones Affid., par. 28; West Affid., par. 5, 6, 7; Boulware Affid., par. 5; Collins Affid., par. 9; Hollgarth Dep., pp. 16, 17-18)

30.     As a result of the information received on June 18, 2003 regarding an escape plot and the discovery of contraband and cell damage during the shakedown on that date, Jail administrators determined that Hollgarth and the other six prisoners identified as being part of the escape plot presented security risks and would be removed from general population and housed in administrative segregation in Trod 5.  Hollgarth's history of attempted escapes from custody also was a factor in the decision to place him in administrative segregation[4]. (L. Jones Affid., par. 29)

31.     Pods A and C in Trod 5 are utilized for purposes of disciplinary segregation and administrative segregation.  Pods A and C are similar in design.  Each pod contains nine single person cells which open on to a dayroom. Each cell contains a desk, stool, sink, and commode.  The dayroom contains a table, chairs, telephone, and shower.  Each cell has 715 square feet.  Each dayroom has 1065 square feet of space[5].  (L. Jones Affid., par. 30; Hollgarth Dep., pp. 20-21)

32.     The cells in Trod 5 are comparable in size to the single-person cells in the trods housing the Jail's general population. (L. Jones Affid., par. 30)

33.     Prisoners in Pods 5A and 5C are confined to their cells except for a period of one hour during each day in which each detainee is allowed access to the dayroom. Only one prisoner at a time is allowed to use the dayroom. (L. Jones Affid., par. 31; Hollgarth Dep., pp. 39-40)

34.     As a result of the reported escape plot on June 18, 2003 and the discovery of contraband and damaged items in their cells, Hollgarth and the other six prisoners placed in administrative segregation were subjected to two shakedowns a day, one occurring

_____

[4]See preceding footnote.

[5]Plaintiff size of cells and day room.  Defendants object to plaintiff's response. Defendants' objections are sustained for the following reasons: Plaintiff's response does not address the first five sentences in paragraph 31; the response is not supported by citation to admissible evidence; plaintiff's assertion regarding the size of the day room lacks the necessary specificity; plaintiff's assertions, even if they had been admissible and supported, are not material because the plaintiff does not dispute that cells in general population and administration segregation are comparable in size and design.

during first shift, and the other occurring during second shift.  Jail administrators ordered these shakedowns in the interest of the safety and security of the Jail.  (L. Jones Affid., par. 32; Hollgarth  Dep., pp. 24,25.)  The plaintiff complained to Sheriff Jerry Dawson about the daily shake-downs and "strip searches."  (Plaintiff's Exhibit [61].)

35.    The following protocol was followed in the Jail with respect to the twice-daily shakedowns of prisoners considered to be escape risks:

> (a) At least two male officers were assigned to conduct the shakedown of each detainee.  A shakedown of more than one prisoner might be conducted simultaneously, so more than two officers usually were involved in the shakedowns. (L. Jones Affid., par. 33; West Affid., par. 11; Kramer Affid., par. 7; Hollgarth Dep., pp. 22-24)

> (b) Only male officers participated in or were present during the shakedowns of male prisoners.  Id.

> (c) On occasion, when conditions in a pod suggested that prisoners might be disruptive during a shakedown, a male supervisor was positioned in the dayroom with a taser gun directed at the floor but ready for use if necessary to subdue a prisoner.  Id.

> (d) One officer would enter the cell of each prisoner and ask the prisoner to move to the back of the cell and face the officer, while a second officer stood in the doorway to the cell. The prisoner would be told to remove his jail jumpsuit and underwear and to submit to a visual body search (a "strip search") in which he was instructed to open his mouth, move his hands through his hair, lift his arms and expose each underarm, lift his sexual organs, and then turn around, bend over and expose his anal cavity.  Id.

> (e) The prisoner then was told to put on his clothes and step outside his cell, face the wall, raise his arms, and place his palms on the wall. One officer then searched the cell for contraband, while another officer guarded the prisoner. Id.

36.    The prisoners on lockdown in administrative segregation also were subject to being strip searched on those occasions when they were temporarily moved out of Trod 5, as when they made a court appearance or had visitation. The strip searches were conducted pursuant to the same protocol identified in paragraph 35, above. (L. Jones Affid., par. 34)

37.    On occasion, female corrections officers, while engaged in the course of performing their duties, would enter trods during a shakedown.  On such occasions, the female officers did not participate in the shakedown and did not observe any male detainee while he was unclothed.  (Meeks Affid., par. 3,4, 5; Martin Affid., par. 6, 7)

38.    Jail policy permits certain correctional officers to utilize a chemical spray known as Oleoresin Capsicum Foam ("O/C spray") when necessary to control prisoners within the Jail who have become violent, who have repeatedly refused to comply with lawful commands when the prisoner's refusal would require the use of physical force, or when

the prisoner poses a threat to correctional staff or others within the Jail. (L. Jones Affid., par. 35; Def. Ex. 16)

39.    Only correctional officers who have been trained in the use of O/C spray are permitted to carry it or use it within the Jail.  (L. Jones Affid., par. 36; Def. Ex. 16) 40

40.    O/C spray will cause a temporary skin irritation which can be remedied through the application of cold water.  (L. Jones Aff'd, par. 37.)

41.    On August 24, 2003, officers Chris Patient, Craig Kramer, Robert Jordan, and Scott Shull were conducting shakedowns on second shift in Pod 5C.  During the course of the shakedown of Hollgarth, Patient ordered Hollgarth to step out of his cell; Hollgarth complied and Patient and Kramer entered Hollgarth's cell to search the cell.  (C. Patient Affid., par. 11; Kramer Affid., par. 12; Jordan Affid., par. 9; Def. Ex. 12, 13, 14, 15) Thereafter, the following occurred:

      (a) Jordan ordered Hollgarth to face the wall and place his hands on the wall.  Hollgarth did not comply.  Jordan again ordered him to place his hands on the wall.  Hollgarth said "You ask me. You don't tell me." Id.

      (b) Patient stepped out of Hollgarth's cell and asked Hollgarth twice to place his hands on the wall.  Hollgarth did not comply. (Id.)

      c) Patient then put his hand on Hollgarth's back and pressed him against the wall.  Patient began to take Hollgarth to the floor[6].  Id.

      (d) Shull then walked up and directed O/C spray in the direction of Hollgarth's face.  Most of the spray hit the wall; part of the spray caught Hollgarth in the area of the mouth and part of the spray hit Patient.  Id.

      (e) Patient got Hollgarth to the floor and Kramer and Patient then handcuffed Hollgarth's hands behind his back.  Id.

      (f) While on the floor, Hollgarth said some of the O/C spray had gotten in his mouth.  Then Hollgarth vomited[7].  Id.

      (g) Patient, Kramer, Jordan, and Shull secured Hollgarth in a restraint chair for one hour.  When Hollgarth was seated in the restraint chair, he said to the officers: "That did not hurt.  Besides, I wanted to get out of that cell and go tot he

---

[6]Plaintiff disputes the he struggled with officers.  Defendants objects.  The defendants' objection is sustained because 1) plaintiff's response does not address or dispute the first and third sentences in defendants' statement; 2) plaintiff's response to the second sentence is not response, but rather is argumentative and lacks the necessary specificity; 3) plaintiff's response is not supported by the cited exhibit; and 4) plaintiff's dispute with the second sentence of defendants' statement is not material given plaintiff's admission of other elements of the incident described in defendants' statement of fact, par. 41.  See affidavits and exhibits cited by defendants in support of par. 41, in particular the Affidavit of Chris Patient, par. 11(c) and Defendants' Exhibit 15.

[7]Plaintiff disputes that he told officers "he did not feel good."  Defendants objects to plaintiff's response.  The defendants' objections is sustained beause 1) the plaintiff addresses only one assertion in the statement ("Hollgarth said ... he did not feel good"), and does not address or dispute the balance of the statement; 2) plaintiff's response is not supported by the cited exhibits; and 3) plaintiff's dispute, even had it been supported by admissible evidence, is not material given the undisputed facts regarding the occurrence on August 24, 2003.

restraint chair."[8]  Id.

42.  On August 24, 2003, after Hollgarth was released from the restraint chair, he apologized to Chris Patient, saying that he just wanted to get out of his cell for awhile. (C. Patient Affid., par. 12)

43.  At no time on August 24, 2003, did Hollgarth complain that he was hurt or injured or request medical care. (C. Patient Affid., par. 17; Kramer Affid., par. 16; Jordan Affid., par. 13)

44.  At no time on August 24, 2003, did Hollgarth complain that the O/C spray had any lingering effect on him.  Hollgarth did not complain of skin or eye irritation and did not appear to the officers to be experiencing any lingering effects from the O/C spray. (C. Patient Affid., par. 16, 17; Kramer Affid., par. 15, 16; Jordan Affid., par. 12, 13)

45.  Bradley Patient, Boulware, and Shaw were not involved in the shakedown of Hollgarth or his cell on August 24, 2003 or in the altercation with Hollgarth that occurred at that time. (Patient Affid., par. 10; Jordan Affid., par. 11; C. Patient Affid., par. 15; Kramer Affid., par. 14)

46.  The seven prisoners who had been placed on deadlock in administrative segregation were eventually returned to general population when in the judgment of Jail administrators their conduct while in administrative segregation demonstrated that they presented a reduced security risk.  After their return to general population, these prisoners were subject to a visual body search pursuant to the Jail's shakedown protocol whenever they were transferred to a new cell or otherwise moved within the Jail. (L. Jones Affid., par. 38)

47.  Hollgarth remained in administrative segregation until September 8, 2003, when he was returned to the Jail's general population. Thereafter, while Hollgarth was in general population, he was transferred to a different pod every week or two weeks. Whenever Hollgarth was moved to a different cell, he was subject to a shakedown, following the same protocol outlined in paragraph 35, above. (L. Jones Affid., par. 39)

48.  Sheriff Dawson has contracted with Health Professionals, Ltd. to provide medical services to prisoners in the Jail by making available, as needed, a doctor and a nurse to deal with the medical needs of the prisoners. (L. Jones Affid., par. 40)

49.  The Jail nurse conducts sick call at the Jail seven days a week. (L. Jones Affid., par. 41)

50.  Prisoners with medical needs can be seen by the Jail nurse by filling out an Inmate Request Form and submitting the form to any corrections officer. A prisoner also can see

the nurse by orally requesting her assistance when she is visiting prisoners within his pod. (L. Jones Affid., par. 42; Hollgarth Dep., p. 45)

---

[8]Plaintiff's dispute that he told officers "that did not hurt.  I wanted to get out of my cell." Defendants' object to plaintiff's response.  Defendants' objection is sustained as 1) the plaintiff's response addresses and disputes only the last sentence; 2) plaintiff's assertions are not suppported by the cited exhibits; and 3) even if plaintiff's assertions were supported and admissible, they would not be material given the undisputed facts regarding what occurred on August 24, 2003.

51.    Hollgarth was able to see the Jail nurse when he needed to either by submitting an Inmate Request Form or by speaking to the nurse on an occasion when she was in his pod. (Hollgarth Dep., pp. 45-46; Def. Ex. 19,20,22,23; L. Jones Affid., par. 43)

52.    On April 30, 2003, Hollgarth received an initial medical exam from the Jail nurse who took note of his medical history. (L. Jones Affid., par. 44; Def. Ex. 17) On that date, Hollgarth refused the opportunity to receive a physical examination from the Jail doctor, Dr. Stephen Cullinan. (L. Jones Afid., par. 44; Def. Ex. 18)

53.    Hollgarth submitted Inmate Request Forms with respect to medical needs on July 19, 2003, August 10, 2003, November 28, 2003, and January 3, 2004. On each occasion, the Jail nurse responded to his request. (L. Jones Affid., par. 45; Def. Ex. 19,20,22,23)

54.    On June 18, 2003 or thereafter, Hollgarth did not request to see the Jail nurse or Jail doctor with respect to any injury received on or about that date. (Hollgarth Dep., pp. 43-44; Collins Affid, par. 10, 11; L. Jones Affid., par. 46)

55.    On those occasions when Hollgarth was seen by the Jail nurse or the Jail doctor after June 18, 2003, he did not complain to them or request medical care with respect to any injury received on that date. (Hollgarth Dep., pp. 43-44; Def. Ex. 20,21, 22)

56.    On August 19, 2003, Hollgarth was seen by Dr. Cullinan with respect to a complaint by Hollgarth that he had a problem with his knee. (L. Jones Affid., par. 47; Def. Ex. 21)

57.    On August 24, 2003 and thereafter, Hollgarth did not request to see the Jail nurse or Jail doctor with respect to any injury received on that date. (Hollgarth Dep., pp. 43-44; L. Jones Affid., par. 48)

58.    On those occasions after August 24, 2003, when Hollgarth was seen by the Jail nurse or Jail doctor, he did not complain to them or request medical care with respect to any injury received on that date. (Hollgarth Dep., pp. 43-44; Def. Ex. 22, 23)

59.    On March 11, 2004, Hollgarth entered a plea of guilty and was convicted on charges of theft, two counts of residential burglary, robbery, aggravated fleeing from police, resisting a police officer, and aggravated battery. Hollgarth was sentenced to serve 18 years in the Illinois Department of Corrections. (L. Jones Affid., par. 49; Def. Ex. 3; Hollgarth Dep., p. 8)

60.    On March 11, 2004, the charges of attempted escape and criminal damage to state property were dismissed. (L. Jones Affid, par. 50; Def. Ex. 3)

61.    On March 11, 2004, Hollgarth was transferred from the Jail to the Graham Correctional Center maintained by the Illinois Department of Corrections in Hillsboro, Illinois.  (L. Jones Affid., par. 51; Def. Ex. 24)

62.    After his arrival at the Graham Correctional Center of the Department of Corrections, Hollgarth had an opportunity to provide information to Department of Corrections medical personnel regarding any injuries incurred during his detention in the Jail. On March 11, 2004, Hollgarth was interviewed with respect to his medical history, any present illness, and any evidence of trauma. On March 12, 2004, Hollgarth received a physical examination by a doctor.  (Def. Ex. 25)

63.    Hollgarth's Department of Corrections' medical records as of March 11 and 12, 2004 indicate that he did not identify to medical personnel and did not evidence any physical injury, trauma, or disability. (Def. Ex. 25)

## DISCUSSION AND CONCLUSION

In order to plead and prove a claim under 42 U.S.C. $1983, a plaintiff must establish that a defendant deprived him of a right secured by the Constitution or laws of the United States and that the defendant acted under color of state law.  *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996).  It is essential for liability that a defendant be personally responsible for the deprivation of a constitutional or statutory right.  *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  In addition, the plaintiff must establish that a constitutional violation by each defendant caused him injury.  *Walker v. Peters*, 223 F.3d 494, 502 (7th Cir. 2000); *Papapetropoulous  v. Milwaukee Transport Services, Inc.,* 795 F.2d 591, 595 (7th Cir. 1986) ("a causal connection must exist between the defendant's actions and the injury resulting from the constitutional violation").  The courts distinguish a pretrial detainee, such as Hollgarth, from a convicted prisoner.  After arrest and during detention prior to conviction, the rights of the pretrial detainee are derived from the due process clause of the Fourteenth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).  The rights of a convicted prisoner arise form the Eighth Amendment prohibition of cruel and unusual punishment.  *Id.*  The Eighth Amendment protections are extended to pretrial detainees through the Fourteenth Amendment.  *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001).  The due process clause protects the pretrial detainee from any form of punishment.  *Bell*, 441 U.S. at 535-537; *Wilson*, 83 F.3d at 875.

Although the pretrial detainee may not be punished prior to a determination of guilt, he may be subject to confinement and the disabilities necessary to such confinement, such as loss of privacy and of freedom of choice.  *Bell*, 441 U.S. at 537.  The government has a legitimate interest in effective management of the detention facility which justifies the imposition of conditions and restrictions on the detainee.  *Bell*, 441 U.S. at 540.  The government must be able to take steps to maintain security and order in the facility.  *Id.*  When a pretrial detainee challenges a disability imposed on him during confinement, the court must decide whether the disability is imposed for the purpose of punishment or whether it is an incident of some legitimate governmental purpose other than punishment.  *Id.* at 538.

Prison conditions for both pretrial detainees and convicted persons do not reach the threshold of constitutional concern until a showing has been made of "genuine privations and hardship over an extended period of time."  *Duran v. Elrod,* 760 F.2d 765, 759 (7th Cir. 1985), citing  *Bell*, 441 U.S. at 542.  Prison conditions violate the Constitution only where they "deprive inmates of the minimal civilized measure of life's necessities."  *Wilson v. Seiter*, 501 U.S. 294, 198 (1991); *Rhodes v.Chapman*, 452 U.S. 337, 347 (1981); *Delanev v. DeTella*, 256 F.3d 679,683 (7th Cir. 2001).  In cases where conditions of custody are challenged, the courts emphasize that uncomfortable and even harsh conditions are not punitive in themselves.  *Rhodes*, 452 U.S. at 347 (prison conditions which are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society"); *Lunsford v. Bennett*, 17 F.3d 1574, 1581 (7" Cir. 1994) ("The Constitution does not require prison officials to provide the equivalent of hotel accommodations or even comfortable prisons").

In order to establish a claim that prison conditions violate the Constitution, a prisoner's burden involves both objective and subjective components. *Farmer v. Brennan*, 51 1 U.S. 825, 834 (1994); *Delaney*, 256 F.3d at 683. First, the alleged deprivation must be, objectively, sufficiently serious. *Id.* Only "extreme deprivations" result in the denial of "the minimal civilized measure of life's necessities." *Id.*; *Hudson v. McMillian*, 503 U.S. 1,9 (1992). Second, a prison official must be shown to have been deliberately indifferent to inmate health or safety. *Farmer*, at 834; *Delanev*, at 683 (at minimum, in conditions-of-confinement case, plaintiff must show actual knowledge of impending harm easily preventable). These requirements apply to both convicted prisoners and pretrial detainees. *Mathis v. Fairman*, 120 F.3d 88,91 (7th Cir. 1997).

In the case of supervisory officials, deliberate indifference requires a showing of direct responsibility for improper conduct; the official must have caused or participated in the alleged constitutional deprivation. *Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). Such responsibility means that the unconstitutional conduct occurred either at the direction of the supervisory official or with his knowledge and approval. *Gossmever v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997); *Gentrv*, 65 F.3d at 561. Thus, a plaintiff must present facts demonstrating the supervisor's personal involvement in the allegedly unconstitutional activities. *Bovce v. Moore*, 314 F.3d 884, 888 (7th Cir. 2002); *Jenkins v. Velasco*, 1995 WL 765315, *8 (N.D. Ill.); *Perez v. Lane*, 794 F.Supp. 286, 289 (C.D. Ill. 1992).

Hollgarth claims that correctional officers subjected him to excessive force on June 18, 2003, and August 24, 2003, in violation of his Eighth and Fourteenth Amendment rights. (Complaint, par. 20, 26, 27, 39) The defendants are entitled to summary judgment because the undisputed evidence demonstrates that the force utilized by officers was not excessive, but was justified, minimal, and restrained; was applied in a good-faith effort to maintain discipline under threatening circumstances; and did not cause injury.

The Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *Bell*, 441 U.S. at 535; *Wilson*, 83 F.3d at 875. As with other Fourteenth Amendment claims brought by pretrial detainees, an excessive force claim requires proof that an officer acted with deliberate indifference. *Proffitt v. Ridaway*, 279 F.3d 503, 506 (7th Cir. 2002); *Wilson*, 83 F.3d at 875. The plaintiff on such a claim has the burden of proving that he suffered some harm attributable to the use of force that was clearly excessive to the need presented and was objectively unreasonable in light of the facts and circumstances. *Wilson*, 83 F.3d at 876. A number of objective factors are relevant to the determination whether a correctional officer's use of force was utilized with an intent to punish: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the officer; and (5) any effort made to temper the severity of a forceful response. *Wilson*, 83 F.3d at 876, citing *Hudson*, 503 U.S. at 7. While a significant injury is not required to establish a claim of excessive force, such a claim cannot be predicated on a de minimus use of force. *DeWalt v. Carter*, 224 F.3d, 607, 620 (7th Cir. 2000)(shoving a prisoner against a door frame, resulting in bruising, was de minimus). *See, also, Hudson*, 503

U.S. at 9 (not every push or shove violates a prisoner's constitutional rights).

The Seventh Circuit has observed that, when claims of excessive force arise in the context of a jail disturbance, it is appropriate to apply the Eighth Amendment standard, which considers whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Wilson*, 83 F.3d at 876-877, citing *Hudson*, 503 U.S. at 7. In resolving such Eighth Amendment claims, the courts consider the same objective factors utilized under the Fourth Amendment standard cited above. *Hudson*, 503 U.S. at 7. Thus, as a practical matter, it makes no difference which standard the court applies to Hollgarth's excessive force claims.

"Considering the fact that convicted prisoners and pretrial detainees are held together in correctional facilities, we recognize the impracticality of separate standards for these two groups in the context of a jail disturbance. Indeed, the Supreme Court has stated that there is no reason to distinguish between the two groups in reviewing challenged security practices because there is no basis to conclude that pretrial detainees pose any lesser security risk than convicted inmates." Bell, 441 U.S. at 546 n. 28, 99 S.Ct. at 1878 n. 28. Thus, here both of Hollgarth's excessive force claims should be analyzed under the Eighth Amendment standard since both involved disturbances in a setting where both detainees and convicted persons were imprisoned. *Wilson*, 83 F.3d at 876-877. On June 18, 2003, officers were presented with evidence of an escape plot involving Hollgarth, who was known to have made previous attempts to escape from custody. On August 24, 2003, Hollgarth had repeatedly refused to comply with officers' orders. The controlling question is whether the force was applied "maliciously and sadistically to cause harm," or applied in a good-faith effort to maintain or restore discipline. *Wilson*, 83 F.3d at 876-877, citing *Hudson*, 503 U.S. at 7. The evidence here does not establish liability under such a standard. Even if the court were to apply the Fourteenth Amendment standard, the conduct of the defendant officers does not demonstrate deliberate indifference to Hollgarth's rights. These conclusions are supported by consideration of each of the objective factors used to determine whether or not an officer acted reasonably.

Need for Force. Both incidents presented circumstances requiring employment of a minimal amount of force, at least initially. On June 18, 2003, officers faced the need to simultaneously extract from their cells seven prisoners reportedly involved in an escape plot. In order to forestall any disturbance and facilitate a shakedown of the prisoners and their cells, officers had to act quickly to handcuff the prisoners and move them out of their cells. With Hollgarth asleep on his bunk, it was inevitable that contact would occur as officers extracted him. On August 24, 2003, Hollgarth repeatedly refused to comply with officers' orders, presenting a situation where minimal force was necessary in order to obtain compliance. Both instances presented a need for the use of force in a good-faith effort to maintain order and discipline. The force was necessary to obtain compliance from the uncooperative plaintiff.

Amount of force employed. In both instances, the amount of force used was commensurate with the need presented. On each occasion, the officers merely employed conventional methods to obtain Hollgarth's compliance. On June 18, they used the force

13

necessary to get Hollgarth's hands cuffed behind his back as he laid on his stomach.  On August 24, different levels of force were used as Hollgarth's resistance increased - - a hand to the back, a single spray of OIC spray, taking him to the floor, and cuffing him.  These were reasonable responses to the needs presented.

Threat perceived by officers.  Given the circumstances in both instances, it was reasonable for officers to believe that Hollgarth presented a threat.  On June 18, there was a report that Hollgarth, a known escape risk, was part of an escape plot and that the prisoners involved were attempting to assemble weapons.  Officials had to assume that Hollgarth and the other prisoners presented an immediate escape threat and a threat to their safety.  On August 24, Hollgarth's refusal to comply with orders and the escalating confrontation presented threats to officer safety and Jail security.  The plaintiff's ongoing disobedience could easily have been interpreted as signs of an imminent confrontation.

Efforts to temper use of force.  The facts before this court indicate the officers tempered the severity of their use of force.  On June 18, the officers did only what was necessary to quickly handcuff Hollgarth so that he could be removed to another cellblock.  On August 24, the officers' response to Hollgarth's disobedience was measured, repeating their orders several times, attempting to cuff him, taking him to the floor when he resisted, and then using the force necessary to get control and handcuff him.  The facts before this court demonstrate reasonable restraint on the part of the officers.

Extent of injury.  There is no objective evidence of injury to Hollgarth.  The only evidence of injury is Hollgarth's self-serving claim that he suffered bruising on his back and the side of his head on August 24, 2003.  (Hollgarth Dep., p. 43)  There is no objective medical confirmation of injury on either June 18 or August 24 since Hollgarth did not complain to the Jail nurse on either occasion, as he could have and as he did on other occasions with respect to other medical problems.  Moreover, the objective evidence is that Hollgarth did not suffer serious or lingering injuries on either occasion since he made no mention of any injury to officers at the time of the incidents or on the subsequent occasions when he did see the Jail nurse or doctor. *Wilson*, 83 F.3d at 876-877, citing *Hudson*, 503 U.S. at 7.  Thus, the evidence is that any injury received by Hollgarth was de minimus and not sufficiently serious to give rise to a constitutional violation.  *DeWalt*, 224 F.3d at 611, 620 (prisoner's evidence was that he suffered bruised back when guard shoved him into door frame, but prison medical staff did not notice any visible injury).  The failure of Hollgarth to complain of injury to the officers or to medical personnel

after each incident is itself evidence that any injuries were de minimus.  *Taylor v. McDuffie,* 155 F.3d 479, 485 (4th Cir. 1998), *cert denied*, 525 U.S. 1181 (1999).

Further, the use of the chemical spray did not constitute excessive force.  Any claim that Hollgarth was subjected to excessive force because he was sprayed with a chemical spray is properly directed only at defendant Shull since he is the only defendant who in the unsettled circumstances of the August 24, 2003 disturbance elected to employ chemical spray.  None of

14

the other defendants utilized chemical spray.  Nonetheless, even if the claim were directed at the other officers present at the time, the use of chemical spray in correctional settings is analyzed as a use of force.  Thus, it would be a violation of the Eighth Amendment for prison officials to use chemical agents "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984), *cert denied*, 470 U.S. 1085 (1985).  However, the use of chemical agents "to subdue recalcitrant prisoners does not constitute cruel and unusual punishment." *Id.*  The use of chemical spray in small amounts where a prisoner has failed to obey a direct order is a reasonable response to a legitimate security concern.  The facts show that the plaintiff was uncooperative.  The defendants used a graduated response to the disturbance, but were forced to resort to O/C spray and physical force when plaintiff refused to accede to voice commands and show of force.  Nothing in the record indicates that defendants used force maliciously and sadistically to cause harm to plaintiff rather than in a good faith effort to restore discipline.  Nothing indicates that plaintiff would be able to prove that he suffered some harm attributable to the use of force that was clearly excessive to the need or objectively unreasonable in light of the facts and circumstances of the time. *Wilson,* 83 F.3d at 876.  Shull's brief direction of O/C spray at a detainee involved in an altercation with other officers was a reasonable and appropriate use of limited force. *Soto*, 744 F.2d at 1270.  For all the reasons stated above, the court finds that Shull or any of the defendants did not use excessive force against the Hollgarth.

The facts do not substantiate the plaintiff's claims of individual responsibility for the use of excessive force.   In the alternative, Hollgarth is unable to provide credible evidence to support his claims of excessive force against particular officers.  Hollgarth claims in his complaint that eight officers ("West, Jones, Kramer, Boulware, and approximate [sic] four other guards") came into his cell on June 18, 2003, "jumped on him while sleep," and struck him.  (Complaint, par. 20)  Hollgarth's claim changed at his deposition, when he testified that only three or four officers entered his cell and that the only officer he could identify was Kramer, who allegedly jumped on Hollgarth's back, grabbed his arms, and cuffed him.  (Hollgarth Dep., pages 15-16) The facts demonstrate that the officers who entered Hollgarth's cell and removed him on June 18 were Terry Collins, Jamie Cox, and John Mayer; that Larry Jones, Randy West, and Stan Boulware were engaged in other functions during the shakedown; and that Craig Kramer and Dewayne Jones were not even on duty in the Jail at that time.  Given this evidence, Hollgarth is unable to satisfy his burden of proving that defendants Kramer, West, Larry Jones, Dewayne Jones, or Boulware were personally responsible for any alleged violation of his constitutional rights on June 18. *Gentry*, 65 F.3d at 561; Foote v. Houi, 2004 WL 2901039 N.D.Ill.,2004 (officer on vacation at time of incident is entitled to summary judgment).

Hollgarth claims in his complaint that "on August 24, 2003, Defendants, Jordan, C. Patient, Kramer, Boulware, B. Patient, S. Shaw, and Anderson, attacked Plaintiff." (Complaint, par. 26)  The incident reports prepared by officers on that date establish that Robert Jordan, Chris Patient, Craig Kramer, and Scott Shull were the only officers involved in the altercation with Hollgarth.  At his deposition, Hollgarth did not identify Stan Boulware, Bradley Patient, or John Anderson as being involved.  (Hollgarth Dep., pages 31-32)  There is no evidence to establish personal responsibility on the part of Boulware, Brad Patient, Shaw, or Anderson for any alleged

violation of Hollgarth's constitutional rights on that date. *Gentrv*, 65 F.3d at 561.

The plaintiff's history of repeated attempts to escape from custody provide legitimate security reasons for frequent body searches. Hollgarth claims that certain defendants engaged in "sexual harassment" in violation of his Eighth and Fourteenth Amendment rights when they participated in shakedowns during which he was subjected to visual strip searches. (Complaint, par. 23-25, 30-32, 41, 42)  The undisputed evidence demonstrates that there is no basis for Hollgarth's claim because he was subject to visual body searches which were done for legitimate security reasons and were performed in a reasonable manner.

Hollgarth's complaint appears to assume that detainees have a right to privacy that results in any visual body search being violative of his constitutional rights. On the contrary, the courts recognize that jails and prisons are places of confinement that necessarily result in a prisoner's loss of freedom of choice and privacy. *Bell*, 441 U.S. at 537; *Peckharn v. Wisconsin Department of Corrections*, 141 F.3d 694, 696-697 (7th Cir. 1998); *Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir. 1995). A jail has a legitimate interest in the maintenance of security and order, needing, for example, to assure that detainees do not obtain weapons or illegal drugs. *Bell*, 441 U.S. at 540, *Johnson*, 69 F.3d at 146. With this in mind, the Supreme Court has said that the courts ordinarily should defer to the expert judgment of jail administrators in matters involving institutional security. *Id.* , 441 U.S. at 540 n.23. Given such security concerns, it is reasonable and not unconstitutional for jail officials to conduct regular strip searches of detainees involving visual body-cavity inspections. *Bell*, 441 U.S. at 558-560.

A strip search of a prisoner is unconstitutional if it violates the Eighth Amendment prohibition of cruel and unusual punishment. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004); *Calhoun v. Detella*, 319 F.3d 936, 939 (7th Cir. 2003). The Eighth Amendment standard is applicable to both pretrial detainees and convicted prisoners. *Whitman*, 368 F.3d at 934; *Johnson*, 69 F.3d at 145-147. Strip searches of prisoners become unconstitutional only where they are maliciously motivated, unrelated to institutional security, and thus totally without penological justification. *Whitman*, 368 F.3d at 934. When such circumstances exist, a strip search becomes harassment unrelated to prison needs and is motivated by an intent to humiliate and inflict psychological pain. *Whitman*, 368 F.3d at 934; *Fillmore v. Page*, 358 F.3d 496, 505 (7" Cir. 2004). A prisoner claiming a constitutional violation has a "heavy burden" of proving (1) that a strip search was not rationally related to a legitimate security interest, and (2) that it was conducted in a harassing manner intended to humiliate and inflict psychological pain. *Bell*, 441 U.S. at 561-562; *Whitman*, 368 F.3d at 934; *Calhoun*, 319 F.3d at 939.

Hollgarth has not satisfied the first element of his burden of proof because the facts establish that there were legitimate, identifiable security reasons for defendants to conduct visual body searches of him and the other prisoners subject to those searches. The body searches clearly were done with penalogical justification. Society had delegated to Sheriff Dawson and his officers the responsibility of holding Hollgarth and other prisoners in custody pending trial. That responsibility carried with it the fundamental need to assure that those prisoners did not succeed in escaping from the Jail. With Hollgarth, his history of repeated attempts to escape

from custody made continued vigilance absolutely necessary.  The record before this court establishes Hollgarth as an incorrigible escape risk who was undeterred by conventional security precautions.  Hollgarth's history of escapes, coupled with evidence that he and other prisoners might be planning an escape, gave the Jail sufficient reason to increase security measures with respect to those prisoners.  In addition, the information that those prisoners were attempting to fashion weapons out of Jail furnishings gave rise to legitimate concern that the safety of Jail staff was threatened.  Increased vigilance was essential in order to discover and deter any such activity.

Since the Jail had legitimate security reasons for the body searches, the searches had penalogical justification and cannot be found to be unconstitutional.  Similar visual body cavity searches have been approved by the courts.  *Bell*, 441 U .S. at 558-562 (visual body cavity searches of detainees after every contact visit were reasonable responses to legitimate security concerns about allowing concealed contraband into prison); *Whitman*, 368 F.3d at 934-935 (prison justified in doing strip search as part of random drug-testing); *Peckham*, 141 F.3d at 695, 697 (strip searches done pursuant to prison security policies were not punitive); *Koner v. Snyder*, 252 F. Supp. 2d 723, 725-726 (C.D. Ill. 2003) (prison had legitimate security reason to conduct strip search of all prisoners in housing unit where shanks were discovered); *Geder v. Lane*, 745 F.Supp. 538, 540 (C.D. Ill. 1990) (prison had legitimate reason to perform visual body cavity search of prisoner returning from court hearing).

Hollgarth also is unable to satisfy his burden of proving that the body searches were excessive in their performance, amounting to calculated harassment unrelated to Jail needs and done with the intent to humiliate and inflict psychological pain.  *Whitman*, 368 F.3d at 934.  The protocol followed by the Jail is evidence that the defendants showed sufficient sensitivity to Hollgarth's personal dignity and acted in a manner designed to be neither harassing nor humiliating.  The courts have consistently upheld prison body searches done in a similar manner.  *Bell*, 441 U.S. at 558, 560-561 (approving as reasonable comparable visual body cavity searches); *Whitman*, 368 F.3d at 932-933, 935 (strip search conducted in bathroom stall by male officers was constitutional); *Fillmore*, 358 F.3d at 501, 505 (strip search conducted by male officers in vacant holding cell was not done in harassing or humiliating manner); *Peckham*, 141 F.3d at 695, 697 (repeated strip searches of female prisoner pursuant to institutional security policy were not done for reasons of harassment).  In significant part, Hollgarth's claim that the body searches were harassing is based on the allegation that female correctional officers were present in the cellblock during shakedowns.  (Complaint, par. 25, 30.)  The evidence actually establishes that women officers were not present when the body searches were conducted in Hollgarth's cell and were only present in or near the cellblock on rare occasions.  But, even if Hollgarth's unsupported allegations were assumed to be true, that would not be evidence of harassment since the case law is clear that there is no constitutional violation merely because female guards regularly observe naked male prisoners.  *Johnson*, 69 F.3d at 146, 150-151.  It is notable that Hollgarth does not complain that female officers conducted body searches of him.  Contrast, *Canady v. Boardman*, 16 F.3d 183, 186-188 (7th Cir. 1994)(complaint alleging that male prisoner was subject to strip searches by female guards stated cause of action).

17

Hollgarth also alleges that the body searches were harassing because a supervisor standing in the pod outside his cell held a tasor gun while shakedowns were being conducted in the pod. (Complaint, par. 23.)  Hollgarth admits that the tasor was never used on him. (Hollgarth Dep., page 25)  Under the circumstances, the practice of having a back-up officer ready with a tasor gun while shakedowns were being conducted of prisoners accused of being part of an escape plot represents a legitimate judgment by jail officials regarding security needs and appropriate levels of deterrence.

Finally, Hollgarth claims that the body searches were harassing because unnamed jail guards made lewd, homosexual remarks during the searches. (Complaint, par. 31.)  However, verbal harassment and intimidation do not violate the Constitution and their occurrence does not turn otherwise permissible conduct into constitutional violations. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (correctional officer's racially derogatory and sexually explicit remarks did not give rise to constitutional claims); *Daniels v. Southfort*, 6 F.3d 482, 484 (7th Cir. 1993) (threatening verbal statements by police officers do not present constitutional concerns).; *Duncan v. Baird*, 2004 WL 2339334, N.D.Ill (verbal abuse and threats and threatening gestures by correctional officers do not rise to level of constitutional violations).

In the end, Hollgarth simply has not presented the necessary "substantial evidence" that the defendants exaggerated their response to the legitimate security concerns presented by Hollgarth.

The Plaintiff is barred from recovering damages or alleged emotional injuries.  Hollgarth seeks compensatory damages for "humiliation, psychological and mental problems, sleep deprivation [and] startled response", all allegedly caused because he was subjected to visual body searches.  (Complaint, par. 32, 41.)  In addition to the substantive deficiencies of such claims, as discussed above,  Hollgarth is barred from recovering damages for mental and emotional injuries.
The Prisoner Litigation Reform Act prevents a prisoner from bringing a civil action "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. §1997e(e).  This provision bars recovery of compensatory damages for mental or emotional injures allegedly suffered as a result of strip searches conducted while in prison. Calhoun, 319 F.3d at 940-94 1.  Hollgarth admittedly suffered no physical injury in the course of the visual body cavity searches conducted at the Jail.  By their nature, the procedures used at the Jail did not involve physical contact with the prisoner during the body cavity search and therefore cannot result in physical injury.  Under such circumstances, the necessary precondition for Hollgarth's damage claims is lacking and, as a result, they are without merit. *Calhoun*, 319 F.3d at 940-941.

The Plaintiff's placement in administrative segregation was not punitive and did not violate his constitutional rights.  Hollgarth claims that Lt. Jones and Sheriff Dawson violated his Fourteenth Amendment right to due process because he was confined in "segregation" for a longer period of time than the other prisoners who reportedly were plotting an escape from the Jail.  (Complaint, par. 33-36, 4.)  Hollgarth has not carried his burden of proof on this claim for

18

reasons discussed in this section and the following section: (1) the undisputed evidence does not demonstrate that Hollgarth's placement in administrative segregation deprived him of the "minimal civilized measure of life's necessities"; and (2) Hollgarth's transfer to administrative segregation did not deprive him of a protected liberty interest subject to the protections of due process.

Hollgarth's placement in administrative segregation was not a prison condition which violated the Constitution.  First, his transfer to administrative segregation was not punitive in nature and the period which he spent in such confinement did not present the objectively serious deprivation which is necessary for a constitutional violation.  *Farmer*, 51 1 U.S. at 834; *Delanev*, 256 F.3d at 683; *Higpason v. Fraley*, 83 F.3d 807, 809 (7th Cir. 1996).  Second, none of the defendants were deliberately indifferent to Hollgarth's health or safety.  *Farmer*, 51 1 U.S. at 834; *Delaney*, 256 F.3d at 683.  The circumstances of Hollgarth's confinement in administrative segregation do not implicate the Fourteenth Amendment because they were not punitive in nature.  The conditions in Trod 5, Pods A and C, were not objectively serious because they did not amount to "extreme deprivations" resulting in the denial of "the minimal civilized measure of life's necessities", such as adequate food, shelter, medical care, or safety.  *Farmer*, 51 1 U.S. at 834; *Hudson*, 503 U.S. at 9; *Delanev*, 256 F.3d at 683; *Hinaason*, 83 F.3d at 809.  Hollgarth does not even claim that his confinement resulted in such deprivations.  The circumstances in administrative segregation actually were not substantially different than the circumstances in the Jail's general population cellblocks, with the exceptions that Hollgarth did not have daily contact with the other prisoners in his cellblock and he had less opportunity to use the cellblock dayroom. These are not differences that are punitive in nature or that has constitutional implications.  *Id.*  Under such circumstances, Hollgarth cannot establish deliberate indifference on the part of any defendant since they could not have had knowledge of a jail condition which presented impending harm to his health or safety.  *Farmer*, 51 1 U.S. at 834; Delaney, 256 F.3d at 683.  Finally, Hollgarth cannot present an actionable violation of §1983 since he is unable to demonstrate that his placement in administrative segregation caused him remediable injury.  *Walker*, 233 F.3d at 502; *Papapetropoulous*, 795 F.22d at 595.

The placement of Plaintiff in administrative segregation did not deprive him of a liberty interest subject to the protections of Fourteenth Amendment due process.  By claiming that his placement in isolation violated his Fourteenth Amendment right to due process, Hollgarth in effect is arguing that his confinement in administrative segregation for a longer period than other prisoners deprived him of a protected liberty interest without the occurrence of appropriate procedural safeguards.  However, under the circumstances of this case, such confinement does not implicate a liberty interest and does not require the protections of due process.           The due process clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property without due process of law."  Although the liberty interests of detainees are necessarily constrained by the fact of their confinement, they do retain protected liberty and property interests.  The courts consider the nature of the prisoner's alleged liberty or property interest when considering whether that interest is protected by due process.  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Higgason*, 83 F.3d at 809.  Liberty interests subject to the protections of due process are limited to situations involving the length of a prisoner's

incarceration or sentence or situations which result in an "atypical and significant worsening" of the prisoner's prison condition.  *Id.*  Placing a prisoner in isolation or segregation by itself is not considered to be a change in his situation which would be atypical or significant.  *Sandin*, 515 U.S. at 484-486; *Thomas v. Ramos*, 130 F.3d 754, 760-762 (7th Cir. 1997).  In general, placement in segregation or isolation does not involve an atypical and significant deprivation where the conditions in segregation or isolation are not significantly different than the conditions of prison life generally.  *Thomas*, 130 F.2d at 762.

Hollgarth's due process claim falls within the ambit of the judicial principle that the courts are to afford appropriate deference and flexibility to prison officials in the day-to-day management of correctional facilities.  *Sandin*, 515 U.S. at 482-483; *Bell*, 441 U.S. at 540; *Thomas*, 130 F.3d at 759.  The decision of Jail administrators to transfer Hollgarth to administrative segregation represented a determination on their part that it was necessary to separate him from other detainees in order to preserve internal security, order, and discipline in the Jail and, as such, was an appropriate exercise of their judgment and expertise.  *Id.*  Their decision as to Hollgarth's continued detention in administrative segregation was influenced by his long history of repeated escape attempts and the extent to which his behavior in detention suggested a continuing threat to Jail safety and security.  These are matters for decision by jail administrators, not by the courts.  *Id.*

Hollgarth had no liberty interest to remain in the general population.  *Sandin*, 515 U.S. at 484-485; *Thomas*, 130 F.3d at 760.  Thus, his claim that his placement in administrative segregation was discriminatory, even if true, did not in itself violate the Constitution and did not give rise to any right to procedural due process.  *Sandin*, 515 U.S. at 484; *Thomas*, 130 F.3d at 760.  A liberty interest arises in the correctional context only if Jail officials had restrained Hollgarth's freedom in a manner that imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life.  *Id.*  Hollgarth did not suffer such a hardship: placement of a detainee in isolation is not considered by the courts to be an atypical or significant change in his situation where the conditions in isolation are not markedly different from conditions in the general population cellblocks.  *Sandin*, 515 U.S. at 485-486 (placement of prisoner in disciplinary segregation for 30 days did not give rise to liberty interest); *Thomas*, 130 F.3d at 760-762 (placement of inmate in segregation for 70 days did not implicate protected liberty interest).  Since Hollgarth's transfer to administrative segregation did not implicate a liberty interest, he had no right to due process.  *Id.*

Further, Hollgarth has not met his burden of establishing that defendants Jerry Dawson, Charles Woodard, Dewayne Jones, and Jerdean Meeks were personally responsible for any violations of his constitutional rights.  Hollgarth's complaint includes Sheriff Dawson and Sgts. Woodard, Jones, and Meeks as defendants because of their supervisory responsibility in the Jail.  However, Hollgarth has not come  forward with the necessary evidence of their personal involvement in any unconstitutional activity.

The Plaintiff claims that Sheriff Dawson had knowledge of alleged misconduct by other defendants and did not intercede either to discipline correctional officers or to halt the

misconduct.  (Complaint, par. 35, 36, 43.)  As Hollgarth has failed to establish individual constitutional violations, as discussed in the preceding section, his claim against the sheriff fails.

Hollgarth names Sgt. Charles Woodard as a defendant (Complaint, par. 8), but directs no claims at Woodard in his complaint and has come forward with no evidence implicating Woodard in any alleged violation of his constitutional rights.  Therefore, Woodson is entitled to summary judgment.

Hollgarth's complaint directs claims at defendant "Jones", but does not specifically direct any claims at Dewayne Jones, as opposed to Larry Jones. (Complaint, par. 20, 22, 23,44)  In fact, the evidence demonstrates that Dewayne Jones was on layoff and not on duty in the Jail at the time of the incidents alleged in the complaint and thus had no personal responsibility for any alleged misconduct.  Therefore Dewayne Jones is entitled to summary judgment.

Hollgarth's complaint claims that Sgt. Meeks had supervisory responsibility for allegedly discriminatory strip searches.  (Complaint, par. 25, 42) However, as already discussed , the shakedown or body searches were not unconstitutional.   Therefore Meeks is entitled to summary judgment.

Pretrial detainees have the right to receive reasonable medical treatment for a serious injury or medical need.  *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976); *Chapman*, 241 F.3d at 845; *Murphv v. Walker*, 5 1 F.3d 714, 717 (7th Cir. 1995).  Inadequate health care for prisoners gives rise to a constitutional violation only when a prison official has been deliberately indifferent to a serious injury or medical need.  *Chapman*, 241 F.3d at 845; *Dunigan v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999).  Not every medically recognized condition presents a serious medical need.  *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997).  An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)).  An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373.

Hollgarth's claim is without merit because the undisputed evidence fails to demonstrate any of the necessary elements of such a claim: (1) Hollgarth did not have a serious medical need; (2) the defendants were not deliberately indifferent to such a need; and (3) Hollgarth did not suffer any resulting injury.  Hollgarth did not experience a serious medical need as a result of his brief exposure to O/C spray.  He suffered only from temporary symptoms: he coughed and vomited once as a result of some spray getting in his mouth; and he felt a burning sensation on his face for "a little while."  (Hollgarth Dep., page 44.)  Hollgarth himself did not consider these consequences serious enough to request medical care.  Such temporary discomfort does not present a serious medical need because it does not require the intervention of a medical professional to provide care or relief.  Exposure to O/C, that result in the expect consequences, is

not a serious medical need.  The defendants did not act with deliberate indifference to a serious medical need because Hollgarth never told an officer that he was suffering any continuing physical effects from the OIC spray and did not request medical care.  Hollgarth did not appear to the officers to suffer from any lingering effects from the spray after he vomited once.  Officers cannot be liable for knowingly disregarding a serious medical need if they are unaware of it. *See, Hinnins v. Correctional Medical Services of Illinois*, 178 F.3d 508, 513 (7" Cir. 1999) (defendants did not know that detainee with dislocated shoulder had serious medical need where symptoms he presented were not ordinarily associated with dislocated shoulder); *Qian v. Kautz*, 168 F.3d 949, 956 (7th Cir. 1999) (jail personnel could not be deliberately indifferent to detainee's serious medical need where they did not know that he was suffering from brain injury);

Finally, the evidence does not demonstrate that Hollgarth suffered any injury as a result of the failure to obtain medical care for him.  This is not surprising.  Where physical symptoms are only temporary and do not require professional medical care, there will be no consequential harm if medical care is not provided.

The Plaintiff's second amended complaint presents claim that are barred by the applicable statutes of limitations.  Defendants are entitled to summary judgment on those claims which were not filed by Hollgarth within the applicable limitations period.  The second amended complaint presents claims that the use of force against Hollgarth on June 18,2003 and August 24,2003 constituted the tort of battery under Illinois law.  (Complaint, par. 20, 26,40.)  These claims were originally pleaded in Hollgarth's initial complaint, which was filed on  March 14, 2005, more than one year after the alleged injuries.  On common-law tort claims brought against local governments in Illinois or their employees, the applicable limitations period is one year from the date of the injury, as provided in §8-101 of the Illinois Local Government Tort Immunity Act. 740 ILCS 1018-101; *DiBenedetto v. City of Chicago*, 873 F.Supp. 106, 108 (N.D. Ill. 1994); *Dirksen v. Citv of Springfield*, 842 F.Supp. 11 17, 1125 (C.D.Ill. 1994). Accordingly, Hollgarth's claim of battery is time-barred.

Finally, the defendants did not deny the plaintiff's his right of access to the courts. Hollgarth's complaint claims generally that "Defendants deprived plaintiff of meaningful access to legal material and his litigation papers." (Complaint, par. 37.)  This claim lacks merit since Hollgarth has not come forward with evidence to support the claim.  Prisoners have a constitutional right of meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977).  In order to assure such meaningful access, prisoners must be provided with either adequate law libraries or adequate assistance from persons trained in the law. *Id.* 430 U.S. at 828.  However, there is no obligation to provide prisoners with both a law library and legal assistance. *Id.*; Martin v. Tvson, 845 F.2d 1451, 1456 (7th Cir. 1988), *cert. denied*, 488 U.S. 863 (1988) (where a prisoner is represented by an attorney in his criminal case there is no need for the prison to provide him with access to a law library).  Moreover, a prisoner claiming that he was denied access to the courts must allege and provide that such denial caused him actual injury. *Lewis v. Casev*, 518 U.S. 343,349 (1996); *Gentry v. Duckworth*, 65 F.3d 555,559 (7" Cir. 1995)

(prisoner must show that denial of access to legal materials caused some quantum of detriment to existing or contemplated litigation); *Martin*, 845 F.2d at 1456.

During his deposition, Hollgarth described this claim as relating to copies of such personal papers as correspondence with Michael Talkington of the Office of Jail and Detention Standards of the Illinois Department of Corrections, *see e.g.*, Complaint, Exhibits D-3, D-4 and copies of newspaper articles.  (Hollgarth Dep., pages 36-39.)  Hollgarth claims that these materials were missing from the box of his belongings in the administrative segregation cellblock, but he is unable to state what happened to the documents or who allegedly took them. (Id., pages 40-41.)  Hollgarth cannot establish the necessary elements of this claim. First, there is no evidence that any defendant is responsible for or had knowledge of the alleged removal of materials from Hollgarth's storage box.  Without evidence linking a defendant to the alleged act, there is no basis for the necessary determination of personal responsibility.  *J.H. v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) ("under §1983, a plaintiff must show the actor was 'personally responsible for the constitutional deprivation'").  Second, Hollgarth has not demonstrated that the loss of any of these personal materials served to deny him access to the courts and thereby caused him actual detriment.  *Lewis*, 518 U.S. at 349; *Gentry*, 65 F.3d at 559.  As a result, the defendants are entitled to summary judgment on the plaintiff's claim that they denied him access to court.

Hollgarth's does not establish an official-capacity claim against the sheriff.  Where plaintiffs allege §1983 claims against government officers or employees in their official capacities, they must establish a separate basis for the official-capacity claims, which in effect are directed at the governmental office or employer, in this case the office of sheriff.  A municipal government or office can be liable under §1983 only where the governmental entity itself causes a constitutional violation.  *Monell v. New York Citv Dept. of Social Services*, 436 U.S. 658, 694 (1978); *Citv of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  There must be a direct causal link between government policy or custom and the constitutional deprivation, such that the government's policy or custom inflicts the injury.  *Id. Starzenski v. City of Elkhart*, 87 F.3d 872,879 (7th Cir. 1996).  Where there is no underlying constitutional deprivation, government policy or custom cannot give rise to a claim pursuant to §1983.  *Citv of Canton*, 489 U.S. at 385; *Hill v. Shobe*, 93 F.3d 418,422 (7" Cir. 1996).  Since Hollgarth has not established a constitutional violation by an individual defendant, the official-capacity claims are subject to summary judgment for the same reasons as the individual-capacity claims. *Hill*, 93 F.3d at 422. Dawson is entitled to summary judgment on Hollgarth's official-capacity claim.
Based on the foregoing, the court enters the following:

1.      Pursuant to Fed. R. Civ. P.56(c), the defendant's motion for summary judgment is granted [42].  The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff.  Any remaining matters are rendered moot, and this case is terminated, with the parties to bear their own costs.

2.      If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present

on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this 19th day of September 2007.


/s/ Michael P. McCuskey

_____

Michael P. McCuskey
Chief United States District Judge

24